CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
for Lynchburg
JUL 31 2009
JOHN F. CORCORAN, CLERK
BY: /s/ S. Jauller
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| MELANIE WILBOURN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 6:08-CV-00025-NKM |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, | ) By: Michael F. Urbanski |
| Commissioner of Social Security, | ) United States Magistrate Judge |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Plaintiff Melanie Wilbourn ("Wilbourn") brought this action for review of the Commissioner of Social Security's ("Commissioner") decision denying her claim for disability insurance benefits and supplemental security income benefits under the Social Security Act (the "Act"). On appeal, Wilbourn contends the Commissioner's decision is not supported by substantial evidence and was not rendered in accordance with applicable law.

This appeal principally concerns the Commissioner's rejection of medical opinions citing functional limitations posed by Wilbourn's depression. Wilbourn was treated by a psychiatrist and examined, at the Commissioner's request, by a psychologist, both of whom noted functional limitations associated with her depression. The ALJ rejects the opinions of these treating and examining sources, borrowing wholesale the analysis of a state agency psychologist who performed a records review on Wilbourn. The ALJ's decision does not address in any meaningful sense, however, the functional limitations imposed by that same state agency psychologist, and the decision ignores the fact that when these limitations were presented to a Vocational Expert ("VE"), that expert opined that a person having those limitations could not sustain competitive work. As such, the ALJ's decision is internally inconsistent, fails to address

key pieces of evidence and lacks a factual basis for the conclusion reached. As such, it is **RECOMMENDED** that this case be **REVERSED** and **REMANDED** pursuant to Sentence Four of 42 U.S.C. § 405(g) with instructions to award disability benefits commencing on February 9, 2005, the date of Dr. Shumate's Consultative Mental Evaluation. (R. 267-72.)

I.

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Social Security Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "'Under the Social Security Act, [a reviewing court] must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct, legal standard.'" Id. (alteration in original) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). "Although we review the [Commissioner's] factual findings only to establish that they are supported by substantial evidence, we also must assure that [his] ultimate conclusions are legally correct." Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980).

The court may neither undertake a <u>de novo</u> review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood,

487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The "[d]etermination of eligibility for social security benefits involves a five-step inquiry." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). This inquiry asks whether the claimant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and if not, (5) whether he or she can perform other work. Heckler v. Campbell, 461 U.S. 458, 460-462 (1983); Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (citing 20 C.F.R. § 404.1520). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Once the claimant has established a prima facie case for disability, the burden then shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"),[1] considering the claimant's age, education, work experience, and impairments, to perform alternative work that exists in the local and

---

[1] RFC is a measurement of the most a claimant can do despite his limitations. See 20 C.F.R. §§ 404.1545(a), 416.945(a). According to the Social Security Administration:

> RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

Social Security Regulation (SSR) 96-8p. RFC is to be determined by the ALJ only after he considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain). See 20 C.F.R. §§ 404.1529(a), 416.929(a).

3

national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## II.

Wilbourn was born in 1978, (Administrative Record, hereinafter "R." 74), and at the time of the ALJ's decision, was considered a "younger individual" under the Act. 20 C.F.R. §§ 404.1563(b), 416.963(b). She obtained a General Education Diploma ("GED") and is able to read, write, and understand English. (R. 90, 85.) Prior to the alleged disability onset date, Wilbourn worked as an assistant manager at a grocery store from 1997 to 2002 where her duties included working the cash register, unloading and loading trucks, and tallying bills. (R. 425.) From October 2002 through February 2003, Wilbourn was an assistant manager at a Dollar General where her responsibilities again included working the cash register, unloading and loading stock, stocking shelves, and ordering merchandise for the store. (R. 424-25.)

Wilbourn was in a severe car accident which resulted in the death of her brother-in-law on February 28, 2003. (R. 426-27.) Wilbourn cites the date of this accident as her alleged disability onset date. (R. 13.) She claims that her ailments of chronic pain from a right ankle injury, moderate to severe headaches, depression, back pain, and sleepiness are collectively linked to the physical and emotional trauma resulting from this accident. (R. 429.) Wilbourn states these problems never surfaced until this car accident occurred. (R. 85.)

Wilbourn first filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income on July 22, 2003. (R. 62, 391.) In both of these applications, Wilbourn cites February 28, 2003 as her disability onset date. (R. 62, 391.) The claims were denied on August 28, 2003, and no further review was sought by Wilbourn. (R. 13.)

4

On August 17, 2004, Wilbourn filed her current Title II application for a period of disability and disability insurance benefits and Title XVI application for supplemental security income on August 2, 2004. (R. 65.) Again, she alleged a disability onset date of February 23, 2003 (R. 13.) Both claims were denied initially and upon reconsideration. (R. 13.) Wilbourn then filed a written request for a hearing, and she appeared and testified at the hearing before the ALJ on April 20, 2006, in Lynchburg, Virginia. (R. 13.)

Following the hearing, the ALJ issued a report on August 25, 2006, denying Wilbourn's applications for a period of disability and disability benefits, and supplemental security income; finding her not to be disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Act. (R. 22.) According to the ALJ's findings, Wilbourn satisfies the insured status requirements of the Act through September 30, 2008, and has not engaged in substantial gainful activity since her alleged disability onset date. (R. 15.) He also agreed that she suffers from a severe combination of impairments including a fracture to the right ankle, a fractured vertebrae, depression, and is unable to perform any past relevant work. (R. 15, 21.) Yet despite these findings, the ALJ concluded Wilbourn still fails in meeting the disability requirements under the Act. (R. 22.)

First, the ALJ stated Wilbourn did not have an impairment or combination of impairments sufficient to meet a Listing as set forth in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1526, 416.920(d), 416.925 and 416.926.) (R. 16.) Second, the ALJ concluded Wilbourn was capable of performing sedentary work (she can lift and/or carry objects weighing up to ten pounds occasionally and less than ten pounds frequently, sit six hours and stand and walk about two hours alternating her position in an eight-hour work day). (R. 17.) Wilbourn also has limited use of her right lower extremity for pushing and pulling function. (R. 17.) The ALJ found that despite her physical and mental impairments, Wilbourn is capable

5

Case 6:08-cv-00025-NKM-BWC Document 18 Filed 07/31/09 Page 5 of 17 Pageid#: 95

of understanding and carrying out simple instructions, sustaining concentration, and maintaining regular work attendance–thus, she is fit to perform sedentary work. (R. 17.) Third, the ALJ supported his decision by referring to the Medical-Vocational Rules which state a claimant can be found to be "not disabled" despite the fact her previous work may be non-transferable. (R. 21.) Lastly, the ALJ reasoned that since Wilbourn is a younger individual under the Act, has at least a GED, and is able to read, write, and communicate in English, there are a substantial number of jobs in the national economy which Wilbourn is capable of performing. (R. 21.)

Wilbourn requested review of the ALJ's decision by the Appeals Council on September 25, 2006, (R. 10), and submitted an additional argument for the Appeals Council to review. (R. 414-415). The Appeals Council denied Wilbourn's request for review on July 18, 2008, (R. 6), and as a result, the ALJ's decision became final. From this decision, Wilbourn appeals.

### III.

This appeal principally concerns the Commissioner's evaluation of the functional limitations posed by Wilbourn's depression.

Wilbourn sustained serious multi-trauma injuries from a car accident on February 28, 2003. (R. 161.) Wilbourn was initially treated for these injuries in the emergency room at Lynchburg General Hospital. (R. 161-67.) Her right ankle was fractured in the collision, and Robert Snydor, M.D. performed an open reduction internal fixation on it. (R. 157-67.) After this procedure, Wilbourn remained at the hospital both for physicial therapy and treatment for pain. (R. 155.) On March 8, 2003, Wilbourn was discharged. (R. 155-56.)

Wilbourn continued seeing Dr. Snydor for her ankle injury. (R. 253-58.) On July 18, 2003, Dr. Snydor removed the hardware from her ankle. (R. 208-09.) Prior to this procedure, Dr. Snydor concluded that "patient's range of motion of the ankle is full"; however, he

6

recommended Wilbourn continue strengthening it. (R. 252.) On September 18, 2003, Wilbourn was again seen by Dr. Snydor for pain in her shoulder blades. (R. 250.) Dr. Snydor did not find evidence of a neurologic compromise or fracture and recommended physical therapy for what he concluded to be a thoracic sprain/strain. (R. 250.) Additionally, he made a note of her depressed nature. (R. 250.)

Wilbourn began another round of physical therapy on September 23, 2003. (R. 235.) Her initial physical therapy evaluation reported significant loss of motion of the thoracic spine and cervical spine, moderate loss of motion of the right ankle, and significant weakness in her bilateral shoulder, girdles, trunk, and ankle. (R. 236.) Wilbourn was discharged from physical therapy on October 20, 2003, reporting a decrease in her upper back pain and some improvement in her ability to lift objects. (R. 223.) Despite these improvements; however, she continued to complain about her inability to hold objects for long periods of time and the pain from her right ankle. (R. 223.) As a result of this continuous pain stemming from Wilbourn's right ankle, the therapist contacted Dr. Snydor's office for a return visit and a re-evaluation. (R. 223.)

On December 3, 2003, Wilbourn again saw Dr. Snydor who advised Wilbourn that she "may well have had a significant articular surface injury" to her right ankle from the automobile accident, and her current pain in her right ankle may be a result of "accelerated degenerative change with the joint." (R. 248.) To combat this, Dr. Snydor recommended ankle-foot orthosis, the use of Celebrex as an anti-inflammatory, and a limitation on her activities. (R. 248.) On March 30, 2004, Wilbourn made yet another visit to Dr. Snydor's office for assistance with her right ankle pain. (R. 247.) Dr. Snydor again diagnosed Wilbourn with "posttraumatic arthritic change" to her right ankle, and administered a steroid shot in addition to advising a bracing program and limiting Wilbourn's activities. (R. 247.)

7

Wilbourn also incurred serious facial fractures (nasal, orbital, and dental) from the February 23, 2003 car accident (R. 163), and received treatment from plastic surgeon, Samuel Fuller, M.D., for these injuries. (R. 205-07.) Dr. Fuller advised Wilbourn to apply massage therapy to her wounds, in addition to waiting to see how they healed on their own. (R. 205-07.) Dr. Fuller concluded in his final note concerning Wilbourn dated June 13, 2003, that she had been successful in applying the massage therapy, and surgical repair to her chin wounds would be re-considered at a later date. (R. 205.)

On June 24, 2004, Wilbourn was seen by family practitioner, Robert Armock, M.D., for her complaint of severe headaches. (R. 317.) Dr. Armock associated these headaches with depression, prescribed headache medications, and referred Wilbourn to a neuro-opthamalogist, noting her pain could be ocularly related. (R. 317.) Wilbourn was seen by neuro-opthamalogist Gail L. Ganser, M.D., who was unable to ascertain an ocular cause for Wilbourn's headaches. (R. 259.) On July 22, 2004, Dr. Armock started Wilbourn on Elavil 25-50 mg at night, prescribed Wellbutrin for her depression, and continued her medications. (R. 316.) The Wellbutrin was later discontinued after Wilbourn suffered from a seizure believed to be connected to the medication. (R. 315.)

On August 26, 2004, Dr. Armock prescribed Symbyax for Wilbourn to remedy what he then described as Wilbourn's "major depression." (R. 312.) On October 21, 2004, Wilbourn again submitted complaints of headaches and depression to Dr. Armock, and on November 18, 2004, was seen by him to address these concerns. (R. 310-11.) Dr. Armock concluded from the visit that Wilbourn's depression was so severe that a psychiatric consult was necessary. (R. 310.)

Wilbourn was seen by psychiatrist Richard Oliver, M.D. on February 8, 2005. (R. 296-300.) Wilbourn conveyed to Dr. Oliver that she had been experiencing depression over the past

8

year and had never suffered from such a condition prior to the February 28, 2003 car accident. (R. 296-300.) Following this consult, Dr. Oliver evaluated Wilbourn's depression and placed it on a level of eight out of ten, noting she was mentally preoccupied with the car accident that occurred in 2003. (R. 299.) He then diagnosed her with major depression, recurrrent, severe at Axis I, and assessed a Global Assessment of Functioning ("GAF") of 40.[2] (R, 299-300.) Dr. Oliver prescribed Effexor for Wilbourn's depression and advised halting her use of Symbayax. (R. 300.)

Wilbourn was also examined by the Commissioner's examining psychologist, Michael Shumate, Ph.D. (R. 267-72.) Dr. Shumate noted Wilbourn suffered from a "major depressive disorder, recurrent, unspecified" at Axis I, serious psychosocial stressors at Axis IV, and assessed a GAF of 50 at Axis V. (R. 272.) Dr. Shumate further surmised Wilbourn had been seriously depressed since the 2003 car accident as a result of both the loss of her brother-in-law and her perceived loss of career due to the significant injuries she incurred. (R. 271.) Dr. Shumate concluded that it would be difficult for her to complete a normal workday due to her pain and depression, and special accommodations along with additional supervision in the workplace would be beneficial. (R. 271-72.)

On March 11, 2005, Wilbourn was again examined by Dr. Oliver who noted Wilbourn continued to be "very depressed," unable to sleep, and still suffering from chronic daily headaches. (R. 295.) Dr. Oliver discontinued the Effexor and started Wilbourn on Lexapro. (R. 295.) On April 5, 2005, Dr. Oliver again examined Wilbourn due to a new complaint of

---

[2] The Global Assessment of Functioning, or GAF, scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic And Statistical Manual Of Mental Disorders Fourth Edition 32 (American Psychiatric Association 1994) [hereinafter DSM-IV]. A GAF of 31-40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. A GAF of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school function.

9

continuous panic attacks. (R. 294.) Wilbourn expressed to Dr. Oliver that such attacks were a result of her fixation on the 2003 car accident in which her brother-in-law was killed. (R. 294.) Shumate wrote that Wilbourn blamed herself for her brother-in-law's death since her brother-in-law was driving at her request. (R. 294.) Dr. Oliver increased the Lexapro, started Wilbourn on Klonopin, and stated he was seeking to obtain weekly counseling assistance for her through Medicaid. (R. 294.) Dr. Oliver also completed a mental limitations assessment form, noting marked and extreme limitations on various indicators of Wilbourn's ability to sustain concentration and attention, marked limitations on indicators of reliability, moderate and marked impairments in social interaction, and extreme limitations in her ability to travel in unfamiliar places or use public transportation. (R. 292-93.) Wilbourn continued seeing Dr. Oliver who repeatedly altered her medications in hopes of alleviating Wilbourn's depression. (R. 366-68.)

In contrast to Dr. Oliver's assessment, February 2005, the Commissioner's non-examining psychologist, Louis A. Perrott, Ph.D., found no marked limitations in Wilbourn's mental residual functional capacity. (R. 274-75.) A few months later, however, on June 15, 2005, another non-examining psychologist appointed by the Commissioner, David L. Niemeier, Ph.D., L.C.P., found marked limitations in Wilbourn's ability to understand and remember detailed instructions, carry out detailed instructions, and set realistic goals or make plans independently of others. Dr. Niemeier also found moderate limitations in four other areas. (R. 334-35.)

A VE testified at the administrative hearing concerning the impact of Wilbourn's functional limitations on her ability to get a job in the national economy. When asked whether a person having the functional limitations reflected in the opinions of Drs. Oliver, Shumate or

10

Neimeier, the VE testified that such a person would not be able to perform work that exists in substantial numbers in the national economy. (R. 451-53.)

## IV.

An ALJ is required to analyze every medical opinion received and determine the weight to give such an opinion in making a disability determination. 20 C.F.R. § 404.1527 (d). A treating physician's opinion is to be given controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) ("[A] treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."); 20 C.F.R. § 404.1527 (d)(2); Social Security Ruling 96-2p. The ALJ is to consider a number of factors which include whether the physician has examined the applicant, the existence of an ongoing physician-patient relationship, the diagnostic and clinical support for the opinion, the opinion's consistency with the record, and whether the physician is a specialist. 20 C.F.R. § 404.1527. A treating physician's opinion cannot be rejected absent "persuasive contrary evidence," and the ALJ must provide her reasons for giving a treating physician's opinion certain weight or explain why she discounted a physician's opinion. Mastro, 270 F.3d at 178; 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."); SSR 96-2p ("the notice of determination or decision must contain specific reasons for the weight given to the treating source's medical opinion and the reason for that weight.").

11

The undersigned finds that the ALJ's evaluation of Wilbourn does not meet the <u>Mastro</u> standard. With regard to Dr. Shumate's opinion, the ALJ states his evaluation "only reveals a snapshot of the claimant's functioning and is an overestimate of the severity of her limitations." (R. 20.) No additional rationale is provided for this conclusory statement, and no medical opinions are cited which supports the ALJ's rejection of the treating physician's opinion. Because Shumate was a treating specialist who actually examined Wilbourn, the ALJ should have provided greater insight as to why it was discounted.

Further, the ALJ's decision does not indicate just what weight is given to Dr. Oliver's opinion. While the decision states that Dr. Oliver's opinion "has been considered," and "is given appropriate weight," it is difficult to discern just what weight was accorded Dr. Oliver's opinion. The ALJ rejects Dr. Oliver's opinion because "his statements regarding her abilities in the area of making occupational adjustments are not consistent with all of the medical and non-medical evidence," and his "opinion contrasts sharply with other evidence in the record and is not consistent with his own treatment records." (R. 20.) However, the ALJ provides nothing to support these conclusions other than a general reference to all of Dr. Oliver's notes and a statement by Wilbourn that she thought she could do office work. The Commissioners own regulations require far more from the ALJ than generalized conclusory statements when rejecting a treating physician's opinion. This is particularly true in this case where both the treating psychiatrist and consulting examining psychologist agree that Wilbourn suffers from significant depression rendering her markedly limited in her ability to function. Moreover, the ALJ failed to provide a sufficient rationale as to why the opinions submitted by Wilbourn's treating physicians were rejected and why the opinions he elected to use were more appropriate.

12

Additionally, it appears from the administrative record in this case that the ALJ did not engage in any independent decision making whatsoever in assessing the medical opinions of Drs. Shumate and Oliver. Rather, it appears from comparison of the text of the ALJ's decision at page 20 of the Administrative Record and the text of the Mental Residual Functional Capacity Assessment done by Dr. Niemeier at pages 336-37 that the ALJ simply adopted the conclusions of Dr. Niemeier contained in his assessment and parroted those findings in his decision.

As regards Dr. Shumate's evaluation, Dr. Niemeier writes as follows:

> **The opinion** stated within the report dated 2/05 provided by Dr. Michael Shumate, an examining source, **has been considered. Certain aspects of the psychologist's opinions are consistent with the residual functional capacity determined in this decision.** The examining source statements in the report **concerning the claimant's abilities in the areas of** making occupational adjustments, **making personal and social adjustments and other work related activities are well supported by the medical evidence and non-medical evidence in file.** However, the examining source statements regarding her abilities in the area of making performance adjustments are not consistent with all of the medical and non-medical evidence in the claims folder. The evidence provided by the examining source **reveals only a snapshot of the claimant's functioning and is an overestimate of the severity of her limitations. Therefore, a great weight cannot be given to the examining source's opinion.** Therefore, the report submitted by Dr. Michael Shumate, dated 2/05 is given appropriate weight and is partially consistent with this assessment.

(R. 336, emphasis added.)

As is clear from consideration of the ALJ's decision, he adopts Dr. Niemeier's conclusions virtually verbatim, as follows:

> His opinion has been considered. Certain aspects of his psychological opinion are consistent with the residual functional capacity determined in this decision. His statements concerning the claimant's abilities in the areas of making personal and social adjustments and other work related activities are well supported by the medical evidence and non-medical evidence in the file. However, his assessment only reveals a snapshot of the claimant's functioning and is an overestimate of the severity of her limitations. Therefore, great weight cannot be given to Dr. Shumate's opinion.

(R. 20.)

13

Concerning Dr. Oliver's opinion, Dr. Niemeier writes:

> **The opinion** stated within the report dated 2/05 provided **by Dr. Richard Oliver,** a treating source, **has been considered. Certain aspects of the psychiatrist's opinions are consistent with the residual functional capacity determined in this decision. The treating source statements in the report concerning the claimant's abilities in the areas of making performance adjustments, making personal and social adjustments and other work related activities are fairly consistent with the other evidence in file. However, the treating source statements regarding her abilities in the area of making occupational adjustments are not consistent with all of the medical and non-medical evidence** in the claims folder. **The psychiatrist's opinion contrasts sharply with other evidence in the record and is not consistent with psychiatrists own medical records, which renders it less persuasive. Finally, the report submitted by Dr. Richard Oliver, dated 2/05 is given appropriate weight and is partially consistent with this assessment.**

(R. 336-37, emphasis added.)

As reflected below, the ALJ adopts wholesale this analysis as his decision:

> Dr. Oliver's opinion has been considered. Certain aspects of his psychiatric opinions are consistent with the residual functional capacity determined in this decision. His statements concerning the claimant's abilities in the areas of making performance adjustments, making personal and social adjustments and other work related activities are fairly consistent with the other evidence. However, his statements regarding her abilities in the area of making occupational adjustments are not consistent with all the medical and non-medical evidence. Dr. Oliver's opinion contrasts sharply with other evidence in the record and is not consistent with his own treatment records (Exhibit 12F), which renders it less persuasive. His opinion is given appropriate weight and is partially consistent with the claimant's determined residual functional capacity.

(R. 20.)

It is clear, therefore, that the ALJ adopts, virtually word for word, the criticism leveled against treating Dr. Oliver and examining Dr. Shumate by state agency psychologist Dr. Niemeier, who performed only a records review. While that in and of itself may be relatively unremarkable, what is perplexing about the ALJ's decision is the fact that after adopting, chapter and verse, Dr. Niemeier's assessment of the opinions of Drs. Shumate and Oliver, in his next

14

breath the ALJ finds the opinions of Dr. Niemeier and the other state agency doctor to be "no longer fully supported." (R. 20.)

It is difficult, if not impossible, to reconcile the ALJ's wholesale adoption of Dr. Niemeier's analysis of the opinions of Wilbourn's treating psychiatrist and examining psychologist on one hand, and the abrupt rejection of the functional limitations found by Dr. Neimeier on the other hand. Further, the last paragraph of § 5 of the decision, which concludes that Wilbourn has no disabling impairments, is devoid of any analysis specific to Wilbourn and cites no evidence whatsoever to support the conclusion reached. Given the internal inconsistency in the ALJ's decision as regards the opinions of Wilbourn's treating psychiatrist and examining psychologist and the lack of any specified factual basis for the conclusion reached in the ultimate paragraph of § 5 of the decision, the undersigned cannot find that the ALJ's decision is supported by substantial evidence.

The ALJ's inconsistent treatment of Dr. Niemeier's assessment of Wilbourn's mental residual functional capacity has other implications for the legal sufficiency of the ALJ's decision. As noted above, while the ALJ accepts Dr. Niemeier's analysis of Wilbourn's treatment history to the extent that it is copied, virtually verbatim, in the ALJ's decision, the ALJ rejects the import of Dr. Neimeier's findings regarding Wilbourn's functional abilities. Indeed, when counsel for Wilbourn questioned the VE about whether a person, having the mental limitations described in Dr. Neimeier's mental residual functional capacity assessment, can perform work that exist in substantial numbers in the national economy, the VE replied that such a person may be able to get a job, but could not keep a job. (R. 453-56.) For that matter, the VE also testified that a person having the mental limitations reflected in Drs. Oliver's and Shumate's assessments could not perform competitive work in the national economy. (R. 451-53.) The ALJ did not address

15

the VE's testimony concerning the vocational impact of the opinions of Drs. Niemeier or Shumate in anything other than a cursory manner. While the ALJ's decision notes this testing in passing, (R. 22), no effort is made to explain why this testimony is effectively ignored. The Commissioner is required to make some effort to explain why such evidence was discounted, rather than simply ignoring it. See Sterling Smokeless Coal Co. v. Akers, 131 F.3d 438, 439-40 (4th Cir. 1997) ("[u]nless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.").

In short, all of Wilbourn's treating and examining sources noted significant functional concerns stemming from her depression. State agency psychologist Neimeier also noted such concerns. When presented with a hypothetical raising these concerns, the VE testified that such a person would not be able to sustain work. Expressly relying on some portions of Dr. Neimeier's opinion, the ALJ brushed aside his opinions as to Wilbourn's functional limitations, along with the opinions of Wilbourn's treating and examining mental health professionals.

As such, the Commissioner's decision is internally inconsistent, conclusory and devoid of any reasoned basis for rejecting the various medical opinions noting the functional implications of Wilbourn's depression.

V.

At the end of the day, it is not the province of the undersigned to make a disability determination. It is the undersigned's role to determine whether the ALJ's decision is supported by substantial evidence. In this case, substantial evidence does not support the ALJ's decision.

Furthermore, the ALJ reached his conclusion in a manner contradictory with the rules imposed by law and the Commissioner's own regulations.

It is **RECOMMENDED** therefore that this case be **REVERSED** and **REMANDED** for calculation of an award of benefits from February 9, 2005, the date of Dr. Shumate's consultative mental evaluation in which he catalogs the functional obstacles posed by Wilbourn's depression. (R. 267-72.)

The Clerk of Court is hereby directed to send a certified copy of this Report and Recommendation to all counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within ten (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

Enter this 31st day of July, 2009.

Michael F. Urbanski
United States Magistrate Judge